J-S66017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ERIN NICOLE EVERETT | |
| Appellant | No. 2046 WDA 2014 |

Appeal from the Judgment of Sentence Entered November 14, 2014
In the Court of Common Pleas of Somerset County
Criminal Division at No: CP-56-CR-0000249-2011

BEFORE:  OLSON, STABILE, and STRASSBURGER,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 21, 2016**

Appellant Erin Nicole Everett appeals from the November 14, 2014 judgment of sentence entered in the Court of Common Pleas of Somerset County ("trial court") following Appellant's bench conviction for, *inter alia*, first-degree murder under Section 2502(a) of the Crimes Code, 18 Pa.C.S.A. § 2502(a).  Upon review, we affirm.

The facts and procedural history underlying this case are undisputed, and recounted in detail on pages 1 through 17 of the trial court's March 7, 2016 Pa.R.A.P. 1925(a) opinion.  Briefly, Appellant was charged with, *inter alia*, first-degree murder for the shooting death of her girlfriend, Tory Elizabeth Minnick ("victim").  Prior to trial, the Commonwealth filed a motion

_____

[*] Retired Senior Judge assigned to the Superior Court.

*in limine*, seeking to exclude the testimony of Antoinette Petrazzi Woods, Ph.D, LPC, whom Appellant sought to present as an expert on Battered Woman Syndrome ("BWS") and Post-Traumatic Stress Disorder ("PTSD"). The Commonwealth argued that Petrazzi Woods did not have specialized knowledge to qualify as an expert witness on these issues. The Commonwealth argued that even if Petrazzi Woods did qualify as an expert, her evaluation of Appellant indicated that Appellant did not meet the full criteria for either PTSD or BWS. Moreover, the Commonwealth argued that BWS was relevant only in cases where a defendant alleges self-defense. The Commonwealth pointed out that Appellant could not make out a theory for self-defense because the victim was asleep when Appellant murdered her. Over Appellant's objection, the trial court granted the Commonwealth's motion.

The case eventually proceeded to a bench trial, at which various witnesses, including Appellant and William Nair, testified. Mr. Nair testified that he exchanged text messages with Appellant, who is the cousin of his then-fiancée, prior to the killing and advised Appellant on how to use her father's gun, and where to purchase ammunition for the gun. Mr. Nair also testified that he did not think Appellant was serious about killing the victim. On cross-examination, when asked about whether he texted a picture of his penis to Appellant, Mr. Nair indicated that he did not. Mr. Nair testified that the picture was sent by his roommate, whom he tried to set up with Appellant. Also, when asked whether he had told anyone prior to trial that

someone else had used his phone, Mr. Nair indicated that he had. He specifically stated that he had told the Commonwealth about it during his last conversation with the district attorney. Upon hearing this, Appellant moved for a mistrial, arguing that the Commonwealth committed a **Brady**[1] violation by failing to disclose to Appellant the identity of the other individual prior to trial. The court disagreed, denying Appellant's motion for a mistrial. In so doing, the trial court concluded that Appellant failed to establish that the picture of the penis would have led to exculpatory or impeaching evidence or that Appellant was prejudiced by its nondisclosure.[2] Sometime thereafter, Appellant took the stand and admitted to murdering the victim while the victim slept. The trial court ultimately convicted Appellant of, *inter alia*, first-degree murder and sentenced her to life imprisonment without the possibility of parole. At the trial court's direction, Appellant filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, raising the following assertions of error:

> [1.] Whether the trial court erred in granting the [Commonwealth's] Motion *in Limine* precluding the testimony of [Appellant's] Expert, Dr. Antoinette Petrazzi-Woods as to Battered Woman Syndrome, Spousal Abuse Syndrome, Post-Traumatic Stress Disorder, and other disorders, thereby prejudicing [Appellant] to an extent that it constitutes reversible error?

---

[1] **Brady v. Maryland**, 373 U.S. 83, 83 S. Ct. 1194 (1963).

[2] The Commonwealth opined that Mr. Nair pinned the penis picture on the other individual because "he was covering his ass with his fiancée." N.T. Trial, 11/12/14, at 1.127.

[2.] Whether the trial court erred by prohibiting [Appellant] from presenting any evidence or experts regarding [Appellant's] mental health, state of mind or mental conditions and disorders, by erroneously relying upon improper evidence including the affidavit of probable cause and police reports severely prejudicing [Appellant]?

[3.] Whether the District Attorney committed prosecutorial misconduct by having ex parte communications with the court during the bench trial proceedings by informing the judge in Chambers immediately prior to [Appellant's] mother's testimony, that she had attempted to smuggle handcuff keys into jail in [Appellant's] court clothing thereby prejudicing the [c]ourt as to the witness?

[4.] Whether the trial court erred in failing to grant a mistrial when during testimony it was discovered that there was an alleged third witness who may have provided exculpatory evidence and whose name and identity were known by the District Attorney who never disclosed the information to the Defense, yet admitted to having knowledge of the witness during the bench trial?

[5.] Whether the trial court erred in failing to mitigate [Appellant's] level of guilt by failing to take into consideration the level and magnitude of aid provided by William Nair, who encouraged, advised, counseled, and otherwise enticed [Appellant] to carry out the crime in her distraught state of mind instead of calling for assistance or help?

[6.] Whether the verdict was against the weight of the evidence?

Appellant's Pa.R.A.P 1925(b) Statement. In response, the trial court prepared a detailed 1925(a) opinion, addressing Appellant's assertions of error *seriatim*. Addressing Appellant's first issue, the trial court concluded that the Commonwealth's motion *in limine* excluding Petrazzi Woods' testimony was timely and that it did not abuse its discretion in granting the motion. In support of its grant of the Commonwealth's motion *in limine*, trial court reasoned that, because Appellant could not establish a claim for self-defense as the victim was asleep when Appellant killed her, Petrazzi Woods' testimony on BWS and PTSD was irrelevant. Additionally, the trial

- 4 -

court noted that Petrazzi Woods was not qualified to be an expert on BWS or PTSD because "there is no indication whatsoever that she possesses any knowledge, skill, experience, training or education to afford her 'specialized knowledge' in the field of BWS and/or PTSD." Trial Court Opinion, 3/7/16, at 24. Alternatively, the trial court concluded that even if Petrazzi Woods were qualified, her testimony would not have helped the trier of fact on these issues, because Petrazzi Woods "ultimately found that [Appellant] suffers from neither BWS nor PTSD." *Id.* at 25. The trial court next addressed Appellant's second assertion of error, namely that the court had erred in relying on the affidavit of probable cause and police reports in concluding that Appellant could not establish a claim for self-defense. The trial court reasoned that under Pa.R.E. 104, it was not bound by the rigors of the evidentiary rules to determine preliminary questions on the admissibility of evidence or the qualifications of an expert.[3] With respect to Appellant's third assertion of error, relating to prosecutorial misconduct, the trial court concluded that Appellant waived the issue by failing to make a timely

---

[3] Even if the trial court had improperly relied on the affidavit of probable cause or the police reports to conclude that Appellant could not establish self-defense because the victim was asleep at the time of the killing, the error was harmless. As noted earlier, Appellant admitted at trial to the fact that the victim was asleep. In *Commonwealth v. Grove*, 526 A.2d 369 (Pa. Super. 1987), we noted that "[a]s a matter of law, any imminence to [the] appellant's perceived risk of death or serious bodily injury ended, as did the conflict on the 'present occasion,' when the victim went to bed and fell asleep." *Grove*, 526 A.2d at 375.

objection. Additionally, the trial court found that "no *ex parte* communications occurred between the District Attorney and the court." Trial Court Opinion, 3/7/16, at 27. The trial court next addressed Appellant's fourth issue relating to a **Brady** violation.[4] The trial court rejected Appellant's argument that a **Brady** violation occurred because the Commonwealth failed to disclose to Appellant Mr. Nair's roommate's use of Mr. Nair's cellphone and the roommate's texting of sexually explicit images to Appellant. The trial court concluded that "Appellant had failed to demonstrate that the undisclosed evidence was favorable to her and that she had been prejudiced by its nondisclosure." **Id.** at 29. With respect to Appellant's fifth assertion of error, the trial court noted that it fully

---

[4] Under **Brady**, "a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." **Commonwealth v. Spotz**, 18 A.3d 244, 275–276 (Pa. 2011) (citation omitted). To prove a **Brady** violation, the defendant bears the burden of demonstrating that: "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant." **Commonwealth v. Koehler**, 36 A.3d 121, 133 (Pa. 2012) (citation omitted). To establish prejudice, the defendant must prove that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Commonwealth v. Appel**, 689 A.2d 891, 905 (Pa. 1997) (citation omitted), **abrogated on other grounds**, **Commonwealth v. Fears**, 86 A.3d 795 (Pa. 2014); **see also Commonwealth v. Bomar**, 104 A.3d 1179, 1189 (Pa. 2014) ("Stated differently, the undisclosed evidence must be 'material to guilt or punishment.'") (citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." **Commonwealth v. Chmiel**, 30 A.3d 1111, 1130 (Pa. 2011) (citation omitted).

considered Mr. Nair's involvement and concluded, based on the evidence presented, that it did not rise to the level of conspiracy. The trial court found that Mr. Nair did not plant in Appellant's mind the idea to kill the victim. *Id.* at 32. On the contrary, the idea to kill was Appellant's, and it was Appellant who, after much deliberation, killed the victim as the victim slept. Finally, addressing Appellant's sixth assertion of error, the trial court concluded that it did not abuse its discretion in denying Appellant's weight of the evidence challenge.

On appeal, Appellant repeats the same assertions of error.[5,6] After careful review of the parties' briefs, the record on appeal, and the relevant

---

[5] Appellant withdraws the issue of prosecutorial misconduct, acknowledging that she "did not formally place [an] objection on the record in open court," and therefore rendering the issue "moot and waived." Appellant's Brief at 28.

[6] We note that Appellant's weight of the evidence challenge is waived, because she failed to properly preserve this issue for our review. A challenge to the weight of the evidence must be raised with the trial judge or it will be waived. Pennsylvania Rule of Criminal Procedure 607 requires that a "claim that the verdict is against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607. This claim must be presented to the trial court while it exercises jurisdiction over a matter since "appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Burkett*, 830 A.2d 1034, 1037 (2003) (citation omitted), *appeal denied*, 927 A.2d 648 (Pa. 2007). Instantly, Appellant failed to raise the weight of the evidence claim orally or in writing prior to or after sentencing. In fact, Appellant raised it for the first time in her Rule 1925(b) statement. Even if Appellant had preserved this
*(Footnote Continued Next Page)*

case law, we conclude that the trial court's Rule 1925(a) opinion, authored by President Judge D. Gregory Geary, cogently disposes of Appellant's issues on appeal. **See** Trial Court Opinion, 3/7/16, at 17-37. We, therefore, affirm the trial court's November 14, 2014 judgment of sentence. We direct that a copy of the trial court's March 7, 2016 Rule 1925(a) opinion be attached to any future filings in this case.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/21/2016

_(Footnote Continued)_ —————————

issue, we still would have concluded that she is not due any relief based on the reasons outlined in the trial court Rule 1925(a) opinion.

CLERK OF COURTS
SOMERSET, PA

COMMONWEALTH        )   IN THE COURT OF COMMON PLEAS

2016 MAR -7 PM 3:57     OF SOMERSET COUNTY,

v.           )       PENNSYLVANIA

FILED FOR RECORD )

ERIN NICOLE EVERETT,    )

                    )

Defendant.     )        NO. 249 CRIMINAL 2011

## OPINION PURSUANT TO Pa.R.A.P. 1925(a)

This opinion is issued pursuant to Pennsylvania Rule of Appellate Procedure 1925(a) and in compliance with the Superior Court's December 10, 2015 order.

## I. PROCEDURAL HISTORY.

On March 25, 2011, a warrant for the arrest of Defendant, Erin Nicole Everett, was issued for the shooting, and bludgeoning death of Tory Elizabeth Minnick (hereinafter referred to as "Tory" or "the victim"). The criminal complaint charged Defendant with criminal homicide, 18 Pa.C.S.A. § 2501(a); first-degree murder, 18 Pa.C.S.A. § 2502(a); third-degree murder, 18 Pa.C.S.A. § 2502(c); voluntary manslaughter, 18 Pa.C.S.A. § 2503(a)(1); aggravated assault, 18 Pa.C.S.A. § 2702(a)(4); and possessing instruments of crime, 18 Pa.C.S.A. § 907(b). Defendant obtained representation by William R. Carroll, Esq. of the Office of Public Defender. On March 28, 2011, upon Defendant's Application for Assignment of Counsel pursuant to Pa. R. Crim. P. 122, we appointed Steven Miller, Esq. as legal co-counsel to represent Defendant. On April 8, 2011, Defendant waived her right to a preliminary hearing as to all charges.

On May 27, 2011, the Commonwealth withdrew the charge of possession of instruments of crime. On June 14, 2011, we heard the Commonwealth's motion to amend the

3-8-16
Copy to   DA, Atty. Dick

76

37 pages

information to add a charge of conspiracy to commit criminal homicide, 18 Pa.C.S.A. § 903(a)(1). We granted the motion.

On June 16, 2011, the Commonwealth petitioned for a grant of use immunity for Defendant, pursuant to 42 Pa.C.S.A. § 5947, so the Commonwealth could call Defendant to testify against her alleged co-conspirator, William Stanley Nair, Jr. We granted the Commonwealth's petition on June 16, 2011.

On July 12, 2011, Defendant entered a plea of not guilty to all charges. Thereafter, we granted several continuances to both Commonwealth and Defendant.[1] On June 18, 2012, Brent Eric Peck, Esq. entered his appearance on behalf of Defendant. On June 21, 2012, we permitted Attorneys Carroll and Miller to withdraw their appearance on behalf of Defendant, having noted that "it appears that [D]efendant is not without financial resources and is otherwise able to employ counsel...."

As indicated in *supra* note 1, we granted a final continuance to Defendant on February 12, 2013. During the hearing conducted on that date, we also directed that "any remaining pretrial issues or motions be filed on or before 4:00 p.m. on Friday, March 1, 2013, or be precluded." Defendant filed a pre-trial motion in limine on March 1, 2013, seeking to preclude "any and all references to text messages as [h]earsay at the trial in this matter...." We conducted a hearing on Defendant's motion in limine on April 2, 2013, after which, we

---

[1] We granted the following continuances: to Commonwealth on July 28, 2011, because evidence was undergoing testing at the crime laboratory; to Defendant on September 19, 2011 for "[a]dditional time to prepare for trial"; to Defendant on December 13, 2011 for "[a]dditional time to prepare for trial"; to Defendant on February 14, 2012 because she "[n]eed[s] more time to prepare"; to Defendant on April 17, 2012 for the "[p]urpose of obtaining Mental Health Evaluation"; to Defendant on July 10, 2010, over the objection of the Commonwealth, because Attorney Brent Eric Peck "was recently retained on entered [his] appearance on June 18, 2012"; to Defendant on September 18, 2012, because "counsel requires additional time for trial preparation"; to Defendant on December 18, 2012, over the Commonwealth's objection, because "counsel need[s] additional time for trial preparation"; to Defendant on February 12, 2013, again over the Commonwealth's objection, because "counsel requires additional time to prepare for trial"—however, we directed that there were to be no further continuances of this case granted at Defendant's request.

2

took the matter under advisement. We denied Defendant's motion on May 9, 2013.

On April 1, 2013, the Commonwealth submitted its Brief in Support of Motion in Limine to Preclude Expert Testimony Regarding Battered Woman Syndrome and/or Post-Traumatic Stress Disorder. However, as Defendant noted in her reply brief dated May 31, 2013, the Commonwealth had up to that point failed to file the actual motion in limine. The Commonwealth remedied this oversight by filing the motion in limine on June 11, 2013. On April 1, 2013, the Commonwealth also submitted a motion for a court-ordered mental health examination of Defendant pursuant to Pa. R. Crim. P. 569. The Commonwealth requested the mental health examination in the event that we were to deny the motion in limine to preclude testimony by Defendant's expert on the issue of Battered Woman Syndrome and Post-Traumatic Stress Disorder. After hearing argument on June 27, 2013, we took the matter under advisement. On July 23, 2013, we issued a memorandum and order granting the Commonwealth's motion in limine.

Defendant filed a notice of appeal on August 21, 2013, challenging our July 23 order precluding testimony by her expert. We heard argument on September 5, 2013 on the question of whether Defendant should be granted permission to proceed with an interlocutory appeal of this issue. On September 9, 2013, we granted Defendant permission to proceed. On September 25, 2013, pursuant to Pa. R.A.P. 1925(b), we ordered Defendant to file a concise statement of matters complained of on appeal. We issued a 1925(a) opinion on October 18, 2013 wherein we advised that the reasons for our order were contained in the July 23, 2013 memorandum of law.

On November 22, 2013, Defendant filed with the Pennsylvania Supreme Court a

3

Petition for Allowance of Appeal.[2] On May 28, 2014, our Supreme Court denied Defendant's Petition.

On October 31, 2014, Defendant waived her right to jury trial. A bench trial was held on November 12 through 14, 2014. On November 14, we found Defendant: not guilty of conspiracy to commit criminal homicide, guilty of criminal homicide, guilty of first-degree murder, guilty of third-degree murder, guilty of voluntary manslaughter, and guilty of aggravated assault. At Defendant's request, we immediately proceeded to sentencing on the offense of first-degree murder. We sentenced Defendant to pay the costs of prosecution and the D.N.A. Detection Fund fee of $250, and incarceration in a State Correctional Institution for life without the possibility of parole. The sentences on the remaining offenses merged into the sentence for first-degree murder.

On December 11, 2014, Defendant filed a Notice of Appeal. On December 16, 2014, we ordered Defendant to file a concise statement of matters complained of on appeal, which Defendant filed on January 6, 2015. We submitted our first 1925(a) opinion in this appeal on March 5, 2015. On December 10, 2015, we received an Order from the Superior Court to "prepare and file within ninety days of the date of this Order a Pa.R.A.P. 1925(a) opinion...detailing the factual and procedural history and addressing all assertions of error raised in Appellant's Pa.R.A.P. 1925(b) statement."

## II. FACTUAL HISTORY.

At approximately 1:00 p.m. on March 25, 2011, Conemaugh Township Police Department contacted the Pennsylvania State Police regarding a homicide at 141 5th Street, Jerome, Pennsylvania. Trial Tr. 1.19, Nov. 12, 2014. The home at 141 5th Street belonged to

---

[2] We believe that the Superior Court must have declined hearing Defendant's appeal; we, however, have nothing in our records to confirm this belief.

4

Jeffrey Everett, Defendant's father, who resided there with his wife, Patricia Everett, and Defendant. *Id.* at 1.30. Trooper Joseph Drzal of the Pennsylvania State Police, along with Corporal Link and Corporal Thomas, arrived on the scene at 1:29 p.m. Patricia Everett had called 911. *Id.* at 1.19-1.20. The information Trooper Drzal possessed as he responded to the scene was that "there was an intruder at the residence of 141 Fifth Street...Two people were assaulted, both female, and one of them was deceased." *Id.* at 1.20.

Trooper Drzal described his first impressions of the scene: "It was a two-story gray house. Initially, right off the bat, you could see the front door was smashed down...[the] majority of the glass was on the porch and the sidewalk. So the preliminary things that came in about an intruder breaking into the house didn't seem right because you can tell...the glass is broken from the inside out." *Id.* at 1.20-1.21; *see also*, Com.'s Ex. C. Trooper Drzal did not immediately enter the residence after observing the porch and door; rather, the officers set up a perimeter to prohibit people from entering or leaving the residence until a search warrant could be obtained. Trial Tr. 1.22. At the time Trooper Drzal arrived on the scene, Defendant was not present, as she was being transported to Memorial Medical Center in Johnstown, Pennsylvania, based on her report that she had been assaulted (i.e., struck in the back) by the intruder. *Id.* at 1.23.

Trooper Drzal eventually obtained a warrant from Magistrate District Judge Susan Mankamyer at 5:00 p.m. to search for "[a]ny weapons, cell phones, computers, any and all media devices, body fluids, hair, cigarettes, tobacco, vehicles, outbuildings, storage units, and all physical evidence in support of the commission of a crime." *Id.* at 1.24; Com.'s Ex. D. Trooper Drzal testified that Trooper Kendiga, of the Pennsylvania State Police Greensburg Forensic Services Unit, was in charge of processing the scene and collecting the evidence.

5

Trial Tr. 1.24.

Even prior to the officers entering the home, Trooper Drzal could see through an open door at the rear of the house that the victim's body was lying at the foot of the steps leading up from the basement. *Id.* at 1.28. Officers also discovered the victim's GMC Envoy SUV, license plate number HNW5410, parked near the back door. *Id.* at 1.28-29; Com.'s Ex. G. Trooper Drzal testified that Commonwealth's Exhibit H accurately depicts what he observed as he peered down the basement steps from outside the house: there are "[c]ement steps leading down into the basement. There's a large pool of blood, looks like on the first two steps, and Tory Minnick is...covered up with a white sheet. There's also some blood on the...brick walls leading down into the basement." *Id.* at 1.31. The sheet had not been placed over the body when Trooper Drzal arrived; his understanding was that the first responding medical personnel placed it there. *Id.*

Somerset County Coroner Wallace Miller completed the victim's death certificate; he listed her time of death as 9:15 p.m. on March 25, 2011 and concluded that the cause of death was "traumatic shock" and "gunshot wound to the head." Com.'s Ex. I. Medical Examiner Karl E. Williams, M.D., M.P.H., and Ashley Zezulak, M.D., conducted an autopsy on the victim and concluded, "Tory Minnick, a 21 year old white female, died as a result of a gunshot wound to the head. A second gunshot wound injury to the head cannot be determined due to absence of facial bones and tissue secondary to postmortem animal activity." Com.'s Ex. J, pg. 3. The "animal activity" in the Medical Examiner's report refers to the fact that one of the two dogs which had been confined to cages in the basement had gotten out of the cage and had begun to eat at the victim's neck and face. Trial Tr. 1.35-1.36.

Tory's father, Robert Minnick, testified that in March, 2011, he, his wife, his sister-in-

law, and his mother-in-law lived at the 405 Cherry Street residence in Meyersdale, Pennsylvania. *Id.* at 1.42. During that period, while Tory was welcome home at any time, and still had her bedroom furnished for her, and she "would stay [at 405 Cherry Street on] weekends from time to time and go back and forth...at that point in time, she was living with Erin." *Id.* at 1.43.

Prior to Tory's relationship with Defendant, Tory had dated a man, Kody Donaldson, during high school and also for a time while they attended Allegheny Community College. *Id.* at 1.45. Mr. Donaldson left Allegheny Community College after his first year, and Tory left in the middle of her second year. *Id.* at 1.45-1.46. Tory's relationship with Mr. Donaldson had been serious enough that the Minnicks allowed Mr. Donaldson to live in their home for a year, and they considered him a part of the household. Mr. Donaldson had even asked for the Minnicks' consent to marry Tory, which they gave. *Id.* at 1.46. Mr. Donaldson had also bought Tory a dog, a German Shepard mix, which lived with the Minnicks (and which was not one of the dogs at the Everett residence on the night of the homicide). *Id.* at 1.47. However, Tory's relationship with Mr. Donaldson was also a tumultuous one; they would argue frequently, Tory would break into tears, and eventually Mr. Minnick told Tory that Mr. Donaldson was no longer welcome at their home. *Id.* at 1.48-1.49.

Defendant, twenty-five years old at the time of the homicide, met Tory in 2009 while the two were working as Certified Nursing Assistants at a nursing home. Trial Tr. 2.304-2.306, Nov. 13, 2014. In June or July of that year, Defendant asked Tory via text if she would be interested in pursuing a same-sex relationship. Tory agreed, and the two began a relationship that included getting together and eating, going for drives, texting each other, and physical intimacy. *Id.* at 2.306-2.307.

7

Because Defendant's mother was disapproving of Defendant's same-sex relationship, when Defendant and Tory decided to move in together, they began living not at the Everett residence, but with Defendant's cousin, Beth Ferguson, and her then-fiancé Billy Nair. *Id.* at 2.308. Defendant and Tory eventually acquired two dogs, which were not allowed at Beth's and Billy's house, so Defendant and Tory moved from that house into the Everett residence. *Id.* at 2.309. Defendant testified that she proposed to Tory and Tory accepted; and that there was an engagement ring. *Id.* at 2.310; Def.'s Ex. 2. As late as fall of 2010, Tory had written a note to Defendant stating, "Will you be Erin Minnick forever? I love you alot and get that smile off your face! Love, Tory." Def.'s Ex. 5.

Defendant testified that she and Tory worked opposing weekends at the nursing home. Trial Tr. 2.315, Nov. 13, 2014. Because Defendant's parents disapproved of the relationship, the atmosphere was tense at the Everett residence, and Tory indicated she did not feel comfortable staying there without Defendant present. *Id.* at 2.317. So on the weekends, when Defendant was working, Tory would purportedly spend that time at the Minnick residence; Defendant later found out, however, that this was untrue. *Id.* After Christmas of 2010, Tory began returning to Meyersdale more frequently, even on days when she had to work. *Id.* at 2.319.

On March 25, 2011, while Tory slept at the Everett residence, Defendant waited for her parents to leave the residence, and in Defendant's words, "I went up and I got the gun out of my dad's gun cabinet...I loaded it, took it back downstairs and I shot her in the head...I went back up the stairs and removed the bullets and put the bullets in another room and put the gun back in the cabinet...I went back downstairs and she was still making noises, so I went and I got the hammer and I hit her in the head." *Id.* at 2.337. Defendant stated that she

8

used a hammer because it was the first thing she saw, and she "panicked." *Id.* Defendant then "went upstairs and I pulled her vehicle around to the...back basement door. I opened the door and went in and I drug her off the bed over to the basement steps...I left her lay there and I went upstairs and I broke the window out of the front door." *Id.* at 2.338. She then called her mother and concocted a story about an intruder. *Id.* at 2.339-2.40.

After reporting her fabricated home invasion story, Defendant was transported to the hospital. Thereafter, Trooper Joel Penatzer, from the Ebensburg Barracks of the Pennsylvania State Police, arrived at the scene. *Id.* at 2.215. Trooper Penatzer testified that the officers had received some information from the hospital which led them "to believe that [they] needed to speak more in depth with Erin...and [he] was summoned to the barracks to interview her." *Id.* at 2.218. As Trooper Penatzer stated, "We already had some preliminary facts and information from the scene coming back and forth and we decided to go in and attempt to get an interview from Miss Everett and allow her to give her version of the events that day." *Id.* at 2.219.

Shortly thereafter, Defendant provided a written statement, authored at 5:22 p.m. on March 25, 2011. That first written statement, which contains the false home invasion narrative, states in relevant part:

> I got back in bed with Tory and fell back asleep. Then all of a sudden I heard someone coming down the basement steps...It was a black figure dressed all in black. I said, "You need to get out of my house." And he just looked at me. Then he said, "I came for her." As soon as he said that Tory woke up. He said, "If you don't come with me, you will face the consequences." Tory said I don't want to be with you. Then he said it again. I said "you need to get out of here." He...started grabbing her wrists...he threw me back down on the bed...and hit me with something. Tory said, "Lave her alone," and he hit her in the face with something...He kept on beating her...I got back up again and he...tried to tie black zip ties around my ankles. I

9

> kicked him away and he rolled me off the bed on the floor...and I heard two shots. Then he wrapped her in the blanket and started pulling her off the bed...and started dragging her towards the cellar steps.

Com.'s Ex. X, pg. 2. This written statement was made after Defendant had been properly given *Miranda* warnings. Com.'s Ex. Y, pgs. 4-6. After Troopers Penatzer and Bernard read the statement, they decided "Trooper Bernard, being a female officer, would initiate the interview; and then we went in and asked Erin...to again tell us her recollection of the events that day as they happened and then [we] noted various discrepancies between her written statement and verbal statement." Trial Tr. 2.229, Nov. 13, 2014.

In the interview, Defendant again related to the police her story about the home invasion. Trial Tr. 2.224. Toward the end of Defendant's account, the troopers confronted her with the inconsistencies between her story and the evidence that had been gathered thus far. Com.'s Ex. Y, pgs. 56-63. We reproduce *infra* some of the salient parts of Defendant's confession from the interview:

> Trooper Penatzer: [...] [N]ow is your chance to put this in your light, in the best light. Like I said, neither one of us think you meant to kill her...I think now that you need to tell us how this happened. Where did you get the gun from?
>
> Erin Everett: It was upstairs.
>
> [...]
>
> Trooper Penatzer: At what point did it get so bad that you had to shoot her?
>
> Erin Everett: Um, that I found out that, that she was talking to Cody...And that she was still sleeping with Cody.
>
> [...]
>
> Trooper Bernard: How did...the whole thing start? Was she awake

10

when you shot her or was she...laying in bed sleeping?

Erin Everett: She was laying in bed.

Trooper Bernard: And she was sleeping right?

Erin Everett: Yeah.

[...]

Trooper Bernard: And, and what made you make the decision to go upstairs and get the gun?

Erin Everett: When he texted her the other day and asked if she was coming to Meyersdale this weekend and staying with him.

[...]

Trooper Bernard: Okay. At what point today did you decide to go upstairs and get the gun?

Erin Everett: After my parents left.

Trooper Bernard: Okay. Was she sleeping at that point?

Erin Everett: Mm-hmm.

Trooper Bernard: How soon after your parents left did you go and get the gun?

Erin Everett: Um, maybe, I don't know, 20 minutes maybe; 15, 20 minutes.

Trooper Bernard: What did you do between the time your parents left and you went to get the gun?

Erin Everett: I was just sitting downstairs. Thinking.

Trooper Bernard: Where were you sitting?

Erin Everett: On the bed.

Trooper Bernard: Beside her – [...] – while she was sleeping?

11

Erin Everett:       Mm-hmm...Yeah, she slept the whole time.

Trooper Bernard:  And what were you thinking about?

Erin Everett:       Thinking about how much I wanted to be with her and all that.

[...]

Trooper Bernard:  And where did you shoot her the first time?

Erin Everett:       Um, in the head.

Trooper Bernard:  [...] And then what did you do?

Erin Everett:       And then she was moaning and everything, and, and I felt bad...And, and I panicked. I should have just called 911 right there. But obviously I panicked...Then, then I shot her again...Then I drug her off [sic] the bed and tried to drag her up the steps. Then that's when I called my mom.

[...]

Trooper Bernard:  You hit her in the head with something?

Erin Everett:       Yeah, a hammer.

[...]

Trooper Penatzer: I have to ask. If you've already shot her twice...is she still moaning or is she gone?

Erin Everett:       No, she was gurgling.

Trooper Penatzer: She was gurgling.

Erin Everett:       Right.

Trooper Penatzer: So while she's gurgling...

Erin Everett:       I hit her and that, and then she stopped.

[...]

Trooper Penatzer: How many times did you hit her with a hammer?

12

Erin Everett:      I, I think twice.

Trooper Penatzer:  And where did you hit her at?

Erin Everett:      Mm, like in the face area.

Trooper Bernard:   Why'd you hit her with the hammer?

Erin Everett:      Because, because she was gurgling. And honestly, she was suffering.

Com.'s Ex. Y, pgs. 64-71, 109-11. Defendant afterward produced a second written statement in which she again confessed. Trial Tr. 2.237, Nov. 13, 2014; Com.'s Ex. Z.

Based on Defendant's initial fabricated report, Trooper Drzal applied for an additional warrant for the search and seizure of "[a]ny and all flesh, body fluids including blood and saliva along with clothing, fingernail scrapings, hair, fibers, on the person of Erin Nicole EVERETT, w/n/f, d.o.b. 12/22/1985." Trial Tr. 1.26, Nov. 12, 2014; Com.'s Ex. F. DNA analysis, conducted by the Pennsylvania State Police Bureau of Forensic Services, Forensic DNA Division, revealed, *inter alia*, that blood on the "left knee area of the gray sweatpants from Erin Everett," and on "the claw end of the hammer" matched victim; and that "the DNA profile obtained from the swab of the trigger, cylinder release, hammer, and front and back of the grip of the Ruger revolver" is consistent with a mixture matching Defendant's DNA profile. Com.'s Ex. Q, pg. 2.

Defendant admitted during her police interview that she had been thinking of committing this crime for "like a week or two," and that it was not a constant thought but, rather, it came and went. Com.'s Ex. Y, pg. 85-86. When Trooper Penatzer asked if there was "a catalyst...that finally brought it to a head," Defendant replied, "Just whenever he [Kody] said [to Tory] about sleeping with her and stuff. And then, and then Billy told me just to go do it." *Id.* at 87. Defendant stated she had text-messaged Billy Nair for "advice" and,

13

per Defendant, "He said just kill her and, and then he told me to send him a picture of the body whenever I did it." *Id.* Defendant also told police that Mr. Nair said he would aid Defendant in getting rid of the victim's body and that he was thinking about putting the victim's body in an "inferno." *Id.* Defendant expressed her belief that Mr. Nair believed Defendant was serious about committing the murder. *Id.* at 89. We reproduce below, in part, excerpts from the text exchange between Defendant and Mr. Nair which occurred on the night preceding the murder:

Defendant to Mr. Nair:     Can I buy shells for a gun? Even though I don't own one

Mr. Nair to Defendant:     Yea Y

Defendant to Mr. Nair:     JW

Mr. Nair to Defendant:     O did U kill Tory yet –

Defendant to Mr. Nair:     That's what the shells R for

[…]

Defendant to Mr. Nair:     I just gotta figure out how to use my dads gun.

[…]

Mr. Nair to Defendant:     Well send me a pic of it and I'll explain how 2 when R U shooting her

Defendant to Mr. Nair:     In the morn

[…]

Mr. Nair to Defendant:     Where at in the basement

Defendant to Mr. Nair:     Yep

[…]

Defendant to Mr. Nair:     She is sleeping there tom morning. That's Y I gotta figure this gun out

14

[...]

Defendant to Mr. Nair:    Should I go to Wal-Mart or Gander Mt to get shells

[...]

Mr. Nair to Defendant:    And go to Gander

[...]

Defendant to Mr. Nair:    There should be no reason Y I can't buy shells right

Mr. Nair to Defendant:    Shouldn't B and a pic of the bdoy and I'd like to see one of U fully nude 2 nite

[....]

[sic]. Com.'s Ex. M.

Mr. Nair admitted that he had engaged in this text exchange with Defendant. Trial Tr. 1.111, Nov. 12, 2014. "A couple [of] weeks" prior to the text exchange, Defendant had indicated to Mr. Nair that she knew that Kody wanted to re-establish a relationship with Tory. *Id.* at 1.112. According to Mr. Nair, "[Defendant] said that she…wanted Tory and no one else could have her, and she was going to take care of that. And…[n]othing was said after that up until the 24th whenever she asked me about buying shells and how to load a gun." *Id.* at 1.112-13. Mr. Nair denied that he thought, at the time of the text exchange, that Defendant was serious about shooting Tory. *Id.* at 1.113.

Mr. Nair denied that he had made sexual advances toward Defendant. *Id.* at 1.121. However, during the text exchange at issue, a photograph of a penis was sent from Mr. Nair's phone to Defendant's phone. *Id.* at 1.122-23. Mr. Nair denied that the penis was his. *Id.* at 1.122. He testified that someone else was also using his phone at this time. *Id.* Mr. Nair testified that he had told the District Attorney the "[l]ast time her and I spoke" that someone else had been using his phone. *Id.* at 1.123-24. According to Mr. Nair, the identity of the

15

person who sent the photo and message was Mr. Nair's co-worker and roommate, Matt Hays. *Id.* at 1.128. Mr. Nair allowed this to occur, purportedly because he knew Defendant was homosexual, but believed homosexuality is morally wrong, and wanted to facilitate Defendant's transition to heterosexuality by promoting a relationship between Defendant and Mr. Hays. *Id.* at 1.133.

Defense counsel stated, "This particular piece of testimony is news to me. If this was information provided to the District Attorney…this…tends to be a grave violation…under the circumstances." *Id.* at 1.124. Defendant thus moved for a mistrial "for lack of disclosure of evidence," which we denied. *Id.* at 1.128. The motion was renewed and again denied. *Id.* at 1.142-43.

Mr. Nair indicated that when Defendant had asked whether she would have a problem buying the ammunition, he responded with the message "Shouldn't B and a picture of the [body]. According to Mr. Nair, he then, mid-text, handed the phone to Mr. Hays, who texted, "and I'd like to see one of U fully nude 2 nite[.]" *Id.* at 1.146-47. At one point, Defendant asked Mr. Nair if he was sleeping, and Mr. Nair responded, "No, ma'am, I ain't. I have a migraine like crazy," to which Defendant replied, "When you see my naked body, you won't have a migraine." *Id.* at 1.150. When asked how Defendant would know who was using the phone on the other end, Mr. Nair responded, "Beats me." *Id.* at 1.152.

After the text exchange, Defendant went to Gander Mountain; bought ammunition for the gun; went home; sent Mr. Nair a picture of a gun to find out how to load and use it; went to work, and ended her shift at 7:00 a.m., the same time as the victim. Trial Tr. 2.335, Nov. 13, 2014. Defendant and the victim ate breakfast together at Eat 'n Park; the victim went to Defendant's family's house, set her alarm for 11:00 a.m., and went to sleep. *Id.* at 2.336. The

16

victim's phone alarm went off at 11:00 a.m., and she set the alarm to "snooze". *Id.* at 2.337. Defendant waited for her parents to leave the house; she then retrieved the gun; and, while the victim slept, committed this murder in the manner described *supra*.

## III. ANALYSIS.

### A. <u>Our Preclusion of Defense Expert's Testimony.</u>

Defendant's first allegation of error is that we improperly granted the Commonwealth's motion in limine to exclude the testimony of defense expert, Dr. Antoinette Petrazzi Woods. Concise Statement of Errors Complained of on Appeal, 1 (hereinafter "Def.'s Statement"). We stated the reasons for granting the Commonwealth's motion in a Memorandum dated July 23, 2013 (Cascio, P.J.).

As noted, *supra,* on February 12, 2013 we directed that "any remaining pretrial issues or motions be filed on or before 4:00 p.m. on Friday, March 1, 2013, or be precluded." On April 1, 2013, the Commonwealth filed a brief in support of its motion in limine, but as of that date, it had overlooked filing the motion in limine itself. We held that the Commonwealth was not precluded from filing a motion in limine after our March 1 deadline because, while a motion in limine may be filed pre-trial, it is also a motion which may be filed during the occurrence of a trial. Therefore, because our order did not specify that motions in limine were specifically included, but rather only addressed by its own wording pre-trial motions, we found that the Commonwealth's motion in limine was not untimely.

Further, Battered Women's Syndrome ("BWS") and Post-Traumatic Stress Disorder ("PTSD") are relevant, and evidence of such is admissible, only when a claim of self-defense has been raised. In this case, because the facts did not support a claim of self-defense, no testimony regarding BWS or PTSD was permissible under Pennsylvania law. Consequently,

17

Defendant's expert testimony was not permitted to testify. We also found, alternatively, that even if BWS or PTSD testimony were permissible here, Defendant's expert was not qualified to testify to such; and moreover, Defendant's expert had not even found that Defendant met all of the criteria for BWS or PTSD.

We reproduce our Memorandum, inclusive of footnotes and nearly in its entirety, below:

> This case comes before us on the Commonwealth's Motion *In Limine* to preclude expert testimony regarding Battered Woman Syndrome (BWS) and/or Post-Traumatic Stress Disorder (PTSD). For the reasons that follow, the Commonwealth's Motion is granted. [...]

> *Timeliness of the Commonwealth's Motion*

> At the outset, we will address Defendant's averment in his Reply to the Commonwealth's Motion *In Limine* that this Court cannot properly consider the Commonwealth's Motion as it is time barred. Reply ¶¶ 6-8. By Order dated February 12, 2013, this Court directed that "all pretrial issues or motions be filed by 4:00 P.M. on Friday, March 1, 2013 or be precluded." The Commonwealth filed its Brief in Support of Motion *In Limine* to Preclude Expert Testimony Regarding BWS and/or PTSD on April 1, 2013 and, though attached to the Brief, the Motion *In Limine* itself was not filed separately until June 11, 2013.

> The Superior Court of Pennsylvania has held that a "motion *in limine* is a procedure for obtaining a ruling on the admissibility of evidence *prior to or during trial*, but before the evidence has been offered." *Commonwealth v. Johnson*, 582 A.2d 336, 337 (Pa. Super. 1990), *aff'd.*, 626 A.2d 514 (1993) (emphasis added). Because a motion *in limine* may be filed prior to or during trial, it is not solely a "pretrial motion." Accordingly, motions in limine – including the Commonwealth's Motion in Limine to Preclude Expert Testimony Regarding BWS and/or PTSD – were not encompassed by this Court's February 12, 2013 Order[3].

---

[3] Rule 578 of the Pennsylvania Rules of Criminal Procedure, relating to Omnibus Pretrial Motions for Relief, states:

Therefore, the Commonwealth's June 11, 2013 Motion *In Limine* is not time-barred and may properly be considered by this Court.

*Commonwealth's Motion in Limine*

The Commonwealth's Motion in Limine presents two (2) separate issues: (1) whether testimony relating to Battered Woman Syndrome (BWS) and/or Post-Traumatic Stress Disorder (PTSD) should be prohibited, and (2) whether Defendant's proposed expert is unqualified as an expert in BWS....

A.    **Testimony concerning BWS and/or PTDS**

In Pennsylvania, the seminal case concerning the admissibility of evidence of Battered Woman's Syndrome (BWS) and the use of expert testimony regarding BWS is *Commonwealth v. Miller*, 634 A.2d 614 (Pa. Super. Ct. 1993). In *Miller*, the Superior Court recognized that BWS had not been adopted as a separate defense to homicide in Pennsylvania and that the use and acceptability of BWS evidence was unclear. *Id.* at 620. Ultimately, after reviewing two appellate court cases, the Superior Court held the following:

> [BWS] does not represent a defense to homicide in and of itself, but rather, is a type of evidence which may be introduced on the question of the reasonable belief requirement of self-defense in cases which involve a history of abuse between the victim and the defendant. . . . [E]xpert testimony regarding a "battered person syndrome" [is] relevant to the [defendant's] state of mind and [is] not introduced to bolster the credibility of the defendant, but rather, to aid the jury in evaluating the defendant's state of mind given the abusive environment which existed.

*Commonwealth v. Miller*, 634 A.2d 614, 621-22 (Pa. Super. Ct. 1993) (citing *Commonwealth v. Stonehouse*, 555 A.2d 772 (Pa.

---

The omnibus pretrial motion rule is not intended to limit other types of motions, oral or written, made pretrial or during trial, including those traditionally called motions in limine, which may affect the admissibility of evidence or the resolution of other matters. The earliest feasible submissions and rulings on such motions are encouraged.

Pa. R. Crim. P. 578.

1989) and *Commonwealth v. Dillon*, 598 A.2d 963 (Pa. 1991)). In other words, where a defendant has properly raised a self-defense claim, the defendant may introduce evidence of BWS to prove the reasonable belief requirement of a self-defense claim.

However…before a claim of self-defense[4] is "properly in issue at trial, there must be some evidence, from whatever source, to justify such a finding." *Commonwealth v. Black*, 376 A.2d 627, 631 (Pa. 1977). It is true that the Commonwealth bears the burden to prove beyond a reasonable doubt that the defendant was not in fact acting in self-defense, but the defense itself must first be properly raised. *Commonwealth v. Mouzon*, 53 A.3d 738, 742 (Pa. 2012) (stating that a claim of self-defense requires evidence establishing three elements: "(a) [that the defendant] reasonably believed that he was in an imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat.").

[In] *Commonwealth v. Grove*, 526 A.2d 369 (Pa. Super. Ct. 1987)… [the Superior] Court determined that "self-defense was not properly at issue because there was no evidence presented to establish that [defendant] reasonably believed that she or any other person was in *imminent* danger of death or serious bodily injury *on the present occasion when the deadly force was used." Id.* at 372 (emphasis added). Accordingly, although a history of spousal/partner abuse may be present and is "certainly a factor to be considered in determining whether an accused's alleged fear of imminent death or serious bodily injury is genuine and reasonable, it does not alter the requirement that the threat of death or serious bodily injury be imminent *on the present occasion." Id.* at 373.

---

[4] The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion. Additionally a claim of self-defense is further proscribed by the following conditions:

(1) The slayer must have been free from fault in provoking or continuing the difficulty which resulted in the killing;

(2) The slayer must have reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to kill in order to save himself therefrom;

(3) The slayer must not have violated any duty to retreat or avoid the danger.

18 Pa.C.S.A. § 505(a).

Most importantly, the facts and analysis in *Grove* are similar to the present case. In *Grove*, the defendant and victim had been married as husband and wife for twenty-two years. *Id.* at 371. The facts were undisputed that the victim-husband was asleep and drunk at the time the defendant-wife shot and set fire to the victim-husband. *Id.* The defendant-wife contended that she acted in self-defense, based upon the "allegation that throughout her twenty-two year marriage, she and her children were physically abused by the [victim-husband]" and that "her perception of danger on the day of [the] incident was directly affected by the cumulative years of abuse." *Id.* On appeal, defendant-wife argued that the trial court improperly prohibited her from presenting a self-defense claim, and the Superior Court of Pennsylvania disagreed. *Id.*

Because there was no evidence, from whatever source, to justify a finding of self-defense, the Superior Court agreed with the trial court's ruling that a self-defense claim was not properly in issue. *Id.* at 372 (*citing Commonwealth v. Brown*, 421 A.2d 660, 662 (Pa. 1980)). In fact, the court stated:

> [T]he [defendant] in the instant case offered no evidence whatsoever to establish that she or any other person was in imminent danger of death or serious bodily injury on the present occasion when the deadly force was used. The victim was not threatening in any manner; rather, it is undisputed that he was drunk and asleep. While a history of spousal abuse is certainly a factor to be considered in determining whether an accused's alleged fear of imminent death or serious bodily injury is genuine and reasonable, it does not alter the requirement that the threat of death or serious bodily injury be imminent on the present occasion. Assuming that [defendant] was genuinely and reasonably afraid of her husband, the fact remains that whatever danger he presented was not *imminent on the present occasion* as he lay sleeping.

*Commonwealth v. Grove*, 526 A.2d 369, 373 (Pa. Super. 1987) (emphasis original).

Although the facts of the present case are not as clear regarding whether the victim was asleep at the time of the incident, we have found no evidence in the record – from whatever source – to justify allowing a claim of self-defense to reach the jury. We note our review of Defendant's purported expert report. While this report does list approximately five (5)

21

episodes of alleged "battering" by the victim on the Defendant, the report is devoid of any indication that, even assuming *arguendo* that the Defendant was "genuinely and reasonably afraid" of the victim[5], the danger presented by the victim was imminent on the present occasion. *See, Grove, supra.* Moreover, our review of the Affidavit of Probable Cause provides no evidence and/or indication that the victim presented any imminent danger of death or serious bodily injury to the Defendant or anyone else when the Defendant used deadly force on the present occasion. As such, because the victim presented "neither an immediate nor an *imminent* threat of death or serious bodily injury *on the present occasion* when the deadly force was used", a self-defense claim is not properly in issue in the instant case. *Id.* at 375 (emphasis original).

Accordingly, despite the alleged incidents of partner violence between the victim and the Defendant contained in Defendant's purported expert report, it is bereft of any suggestion that the defendant was in fear of imminent death or bodily harm on the day in question. Because there is no evidence from any source supporting the contention that the Defendant was in fear of imminent death or serious bodily injury on the particular occasion in question, a claim a self-defense would be improperly placed before the jury and, therefore, any evidence of BWS relating to Defendants state of mind would be improperly admitted as well. Therefore, we must grant the Commonwealth's Motion *In Limine* to preclude any testimony – expert or otherwise – regarding Battered Woman Syndrome (BWS) and/or Post-Traumatic Stress Disorder (PTSD).[6]

**B. Qualification of Defendant's Expert**

Even if this Court were to allow testimony concerning Battered Woman's Syndrome (BWS) and/or Post-Traumatic Stress Disorder (PTSD), the Commonwealth's Motion *In Limine* seeks to prohibit Defendant's purported expert, Dr. Antoinette Petrazzi-Woods, from being qualified as an expert in the areas of BWS and/or PTSD.

---

[5] However, we note this assumption is illogical given Defendant's admission during her evaluation with Defendant's purported expert that she "wasn't scared [of the victim] because [they] didn't fight all the time...."

[6] Our analysis regarding the admissibility of expert testimony as to PTSD is essentially the same. Evidence pertaining to PTSD may be introduced on the question of the reasonable belief requirement of self-defense claim. *Commonwealth v. Pitts*, 740 A.2d 726, 733-34 (Pa. Super. Ct. 1999). Like BWS, Pennsylvania courts do not recognize PTSD as a separate defense to homicide. *Id.* Accordingly, in order for evidence of PTSD to be admitted, the threat of danger or death must be imminent on the present occasion when Defendant responds with deadly force. *Id.*

22

"The decision to admit or refuse expert testimony lies within the sound discretion of the trial court," whose decision will not be reversed absent a clear abuse of that discretion. *Commonwealth v. Johnson*, 582 A.2d 336, 337-38 (Pa. Super. 1990) *aff'd*, 626 A.2d 514 (Pa. 1993). Pennsylvania Rule of Evidence 702, pertaining to testimony by expert witnesses, states the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> **(b)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> **(c)** the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

According to the Supreme Court of Pennsylvania, Rule 702 involves "two distinct inquiries that must be raised and developed separately by the parties, and rule upon separately by the trial courts." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003) (citing *Commonwealth v. Arroyo*, 723 A.2d 162, 170 (Pa. 1999)). The two distinct inquiries are: (1) whether a witness is qualified to render opinions; and (2) whether his or her testimony passes the *Frye* test. *Id.* The proponent of the evidence bears the burden of proving all requirements under Rule 702, including both of the aforementioned inquires. *Id.*

Regarding the first inquiry, the Pennsylvania Supreme Court has developed the following rule for qualifying a witness to testify as an expert: "[W]hether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine." *Miller v. Brass Rail Tavern*, 664 A.2d 525, 528 (Pa. 1995). Rule 702 further directs that a witness be qualified as an expert based upon "knowledge, skill, experience, training, or education." Pa.R.E. 702. Thus, we must determine whether Dr.

23

Antoinette Petrazzi-Woods is qualified as an expert in the field of BWS and/or PTSD.

Upon thorough review of Dr. Petrazzi-Woods' curriculum vitae (CV), it is clear she has Ph.D. in Philosophy, having majored in Executive Counselor Education and Supervision in her graduate program after majoring in Psychology as an undergraduate and states a specialty in Crisis Intervention and Management. Further, she has served as a Forensic Evaluator in both civil and criminal proceedings and has provided testimony as an "expert in the field of psychology and/or counseling."

However, there is no indication whatsoever that she possesses any knowledge, skill, experience, training or education to afford her "specialized knowledge" in the field of BWS and/or PTSD. *See, Miller, supra.* Despite her extensive counseling background, we were unable to locate any training, education or experience that would allow use to conclude that Dr. Petrazzi-Woods has "specialized knowledge on the subject under investigation," i.e., BWS and/or PTSD.

In addition, aside from allegations in Defendant's Brief that Dr. Petrazzi-Woods has been qualified and permitted to testify as an expert in these matters in other courts in the Commonwealth, no detail has been provided in the record or her CV to support these statements. As such, this Court finds that she is prohibited from being qualified as an expert witness in the field of BWS and/or PTSD.[7]

As to the second inquiry, the Pennsylvania Supreme Court has held that "in applying the *Frye* rule, . . . the proponent of the evidence [must] prove that the methodology an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will testify to at trial." *Grady, supra* at 1046. Although the Commonwealth and Defendant allocated much time in their briefs as to the methodology employed by Dr. Petrazzi-Woods, we find this analysis is a moot point for two reasons: (1) as discussed *supra*, Dr. Petrazzi-Woods is unable to be qualified as an expert in either the field of BWS or PTSD, and (2) she concluded that Defendant could *not* be diagnosed with either BWS or PTSD.

Even assuming *arguendo* that this Court found Dr. Petrazzi-Woods was qualified as an expert in the field of BWS and/or PTSD, she concluded that Defendant "does not appear to

---

[7] We note that Defendant argued both in her brief and during argument before this Court that Dr. Petrazzi-Woods had been qualified in the field of BWS and/PTSD "by other Honorable Courts in the Commonwealth of Pennsylvania." *See,* Reply ¶ 15. Despite this allegation, Defendant has not provided this Court with any cases before the Court of this Commonwealth in which Dr. Petrazzi-Woods was qualified as an expert in the aforementioned fields.

24

meet the full criteria for either [PTSD] or [BWS]." Allowing her to testify regarding these opinions and conclusions would violate Pennsylvania Rule of Evidence 702(b), which requires that "the expert's scientific, technical, or other specialized knowledge will *help the trier of fact* to understand the evidence or to determine a fact in issue." Pa.R.E. 702(b) (emphasis added). We find that allowing Dr. Petrazzi-Woods to testify concerning BWS and/or PTSD as it relates to Defendant would *not* help that trier of fact understand the evidence or determine a fact in issue, because she ultimately found that Defendant suffers from *neither* BWS nor PTSD.

Moreover, it is within this Court's discretion to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice or confusion." *Sprague v. Walter*, 656 A.2d 890, 909 (Pa. Super. 1995). Allowing testimony regarding BWS and/or PTSD in the present case would unfairly confuse or mislead the jury to believe that Defendant suffers from either diagnosis when, in fact, Defendant's own expert found that Defendant did not meet the criteria to be diagnosed with either.

Accordingly, we find that Dr. Petrazzi-Woods is prohibited from being qualified as an expert in the field of either BWS or PTSD, because she lacks any *specialized* knowledge, training, education or experience in the subjects under investigation. Further, as to the methodology she employed in evaluating Defendant, we find the analysis unnecessary given that (1) Dr. Petrazzi-Woods is not qualified as an expert in BWS and/or PTSD, and (2) she concluded that Defendant did not suffer from BWS and/or PTSD. In conclusion, we must grant the Commonwealth's Motion *In Limine* to prohibit Dr. Petrazzi-Woods from being qualified as an expert in the field of BWS and/or PTSD.

Memorandum and Order, July 23, 2013 (Cascio, P.J.).


## B. Our Reliance Upon "Improper Evidence" in Precluding Defendant's Evidence and/or Experts Relating to Her Mental Health, State of Mind, Etc.

This allegation of error appears to be an extension of Defendant's first allegation of error. As explained above, we found that evidence of BWS/PTSD was inadmissible on account of there being no viable claim of self-defense in this case. Defendant asserts that this

25

conclusion was based on an erroneous reliance on improper evidence including the affidavit of probable cause and police reports. Def.'s Statement, 2.

Pa.R.E. 104(a) states, "The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." As the comment to the rule stresses,

> [t]he second sentence [permitting the court to step outside of the rules of evidence to preliminarily determine admissibility of evidence]...is based on the premise that, by and large, the law of evidence is a "child of the jury system" and that the rules of evidence need not be applied when the judge is the fact finder. The theory is that the judge should be empowered to hear any relevant evidence to resolve questions of admissibility.

Cmt. to Pa.R.E. 104; *see also, Harris v. Toys "R" Us-Penn, Inc.,* 880 A.2d 1270, 1278 (Pa. Super. Ct. 2005).

Defendant had intended to offer Dr. Petrazzi-Woods as an expert to testify as to BWS/PTSD, and we were authorized under Rule 104(a) to preliminarily determine whether Dr. Petrazzi-Woods' testimony was admissible (and also whether she was qualified to give an expert opinion on these issues). And in answering these preliminary questions, we were also entitled to use the relevant "evidence" at our disposal, notwithstanding the rules of evidence.[8]

For the reasons discussed in our Memorandum and Order, July 23, 2013 (Cascio, P.J.), and in part A *supra*, we concluded that self-defense was unavailable to Defendant as a matter of law, thereby precluding admission of Defendant's evidence as to BWS and PTSD. Our conclusion that self-defense was unavailable to Defendant was based on the facts of this case, which were at our disposal via affidavits of probable cause, which we were authorized to use

---

[8] We note that the affidavits of probable cause we relied upon were subsequently admitted at trial without objection. Trial Tr. 1.32, Nov. 12, 2014. Further, the facts we relied on, in finding that self-defense was unavailable as a matter of law, were undisputed at every point in these proceedings (i.e., the fact that the victim had been sleeping at the time Defendant shot and bludgeoned her).

in answering preliminary questions of admissibility of evidence, pursuant to Pa.R.E. 104(a) and Pennsylvania case law.

## C. **Prosecutorial Misconduct.**

Defendant next claims the District Attorney "committed prosecutorial misconduct by having *ex parte* communications with the court during bench trial proceedings by informing the Judge in Chambers immediately prior to Defendant's mother's testimony, that she had attempted to smuggle handcuff keys into the jail in the Defendant's court clothing thereby prejudicing the Court as to the witness[.]" Def.'s Statement, 2.

We believe this issue has been waived because no objection was made at the time of trial; it is also our understanding that Defendant has withdrawn this allegation of error. Still: we addressed this issue in our prior 1925(a) Opinion, dated March 5, 2015, which we reproduce below:

> I suggest that this issue has been waived because no objection was made at the time of trial. *See, Commonwealth v. Smith*, 606 A.2d 939, 942 (Pa. Super. 1992) ("To preserve an issue for review, a party must make a timely and specific objection at trial..."). Further, I wish to clarify that it was a sheriff's deputy, and later the warden of the county jail, who informed me of the key being found in the shoe. After informing me of the incident, the warden inquired whether I would continue to permit the Defendant to appear in court in dress clothes. I answered in the affirmative. The District Attorney was not involved in the process in any manner. In any event, the incident did not at all prejudice me against the Defendant's mother.

Statement Pursuant to Rule 1925 of the Pennsylvania Rules of Appellate Procedure, March 5, 2015 (Geary, J.). We also clarify that no *ex parte* communications occurred between the District Attorney and the court, because as soon as the District Attorney sought to discuss any aspect of this issue with us afterward, we sent for defense counsel.

27

## D. Denial of a Mistrial Based on an Alleged "Third Witness".

Defendant next contends that it was error for us to not grant a mistrial "when during testimony it was discovered that there was an alleged third witness who may have provided exculpatory evidence [and who was] known [to] the District Attorney who never disclosed the information to the [d]efense, yet admitted to [said] knowledge during the bench trial[.]" Def.'s Statement, 2. Defendant here refers to Matt Hays who was supposedly present during the time when Mr. Nair was exchanging text messages with Defendant relating to the impending murder. We addressed this contention in our prior 1925(a) Opinion, dated March 5, 2015, which we quote verbatim below:

> I denied the Defendant's motion for mistrial because no manifest reason existed to grant the motion. Pa.R.Crim.P. 605. During the testimony of William Nair, it came to light that another person may have been with Nair at the time that he was texting the Defendant on the night before the murder. *See* Trial Transcript pp. 1.123-1.128. According to Nair, he was texting the Defendant concerning her plan to kill Tory Minnick. Present with Nair at that time was his roommate, Matt Hays, who allegedly was sexually interested in the Defendant. Again, according to Nair, Hays used Nair's cell phone to take a photo of his penis and text the photo to the Defendant. Nair stated that he first told the District Attorney about the existence of Hays during his last conversation with her before the trial.
>
> Defense counsel requested a sidebar at which he complained that the Commonwealth had not disclosed to the defense that another person may have been with Nair at the time of the text conversation. The District Attorney stated that she first learned of Nair's claim about two weeks before trial. She went on to explain that she did not believe Nair's story, figuring it to be nothing more than Nair attempting to explain—for the benefit of his fiancée—how a picture of a penis was sent from his phone to the Defendant. The District Attorney said that she did not follow up on the matter because she did not believe Hays even existed. When defense counsel was asked to explain how the failure to disclose the information prejudiced the Defendant, counsel argued that the Defendant was denied an opportunity to

28

investigate the Hays matter herself. Defense counsel was understandably at a loss to articulate how being able to identify the true owner of the penis would have been favorable to the Defendant. Defense counsel then moved for a mistrial "for lack of disclosure of evidence," which we interpreted as a claimed due process violation under *Brady v. Maryland*, 83 S.Ct. 1194 (1963).

The Pennsylvania Supreme Court has stated that "there are three necessary components that demonstrate a violation of the *Brady* strictures: the evidence was favorable to the accused, either because it is exculpatory or it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued." *Commonwealth v. Lambert*, 884 A.2d 848, 854 (Pa. 2005). "*Brady* does not require the disclosure of information 'that is not exculpatory but might merely form the groundwork for possible arguments or defenses.'" *Commonwealth v. Paddy*, 15 A.3d 431, 450 (Pa. 2011)(quoting *Lambert, supra* at 856). "Similarly, *Brady* does not require the prosecution to disclose 'every fruitless lead' considered during the investigation of a crime." *Paddy*, at 450 (quoting *Lambert, supra* at 875).

In this case, I concluded the Defendant had failed to demonstrate that the undisclosed evidence was favorable to her and that she had been prejudiced by its nondisclosure. Therefore, I denied her motion for a mistrial.

Statement Pursuant to Rule 1925 of the Pennsylvania Rules of Appellate Procedure, March 5, 2015 (Geary, J.).

While we have suggested, both at trial and in our prior 1925(a) Opinion, that there is nothing exculpatory about the identity of the owner of the penis pictured in the text message sent to Defendant—nor about the fact that Matt Hays had also been present while Mr. Nair text messaged Defendant—we also question its relevance. As we noted *supra*, pages 15-16, when Defendant received these messages, she clearly believed she was speaking to one person. This is made evident by the fact that she clearly attributed to Mr. Nair remarks allegedly attributable to Mr. Hays (e.g., when Mr. Hays asked for a picture of her naked body,

29

and Mr. Nair subsequently indicated he had a migraine, Defendant remarked that the picture of her body would resolve Mr. Nair's migraine).

There is no issue as to whether the text messages were sent from Mr. Nair's phone; nor as to whether Defendant received them and used the information in those text messages to assist her in committing the murder. Therefore, we fail to see how the alleged presence of another person on Mr. Nair's end of the communications could exculpate Defendant. The facts of this case, including the steps Defendant took prior to the murder, as well as the text messages she received, and how those informed her actions, are unchanged regardless of whom she was communicating with—and, further, the alleged communications from Mr. Hays related not to the crime, but to Mr. Hays' alleged sexual interest in Defendant.

### E. Our "Fail[ure] to Mitigate…Defendant's Level of Guilt….".

Defendant also asserts that we committed error in "failing to mitigate…[her] level of guilt by failing to take into consideration the level and magnitude of aide [sic] provided by William Nair, who encouraged, advised, counseled, and otherwise enticed Defendant to carry out the crime in her distraught state of mind…." Def.'s Statement, 2-3.

We understand Defendant to be arguing that not only did we fail to take into consideration "the level and magnitude of aide provided by William Nair," but that if we had taken such aid into account, we would have found Mr. Nair to be a conspirator to Defendant's crimes, and we therefore would have convicted Defendant of conspiracy. Because we declined to convict Defendant of conspiracy, the argument apparently goes, we must have failed to adequately consider Mr. Nair's involvement in the crime. We address the conspiracy argument first.

Conspiracy occurs when a person:

30

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa. Cons. Stat. § 903(a). Conspiracy thus requires an agreement between persons to commit a crime. However, "[i]n proving conspiracy, direct and positive testimony is not necessary...Indeed, the very nature of the crime of conspiracy makes it susceptible to proof usually by circumstantial evidence." *Commonwealth v. Davenport*, 452 A.2d 1058, 1060 (Pa. Super. Ct. 1982). To ascertain whether an agreement has occurred, "courts have traditionally looked to the relation, conduct, and circumstances of the parties and the overt acts of the co-conspirators in order to find a corrupt confederation." *Id.* Still, the "necessary ingredient of evidence sufficient to support a conspiracy conviction is proof beyond a reasonable doubt of a conspiratorial agreement." *Commonwealth v. Dolfi*, 396 A.2d 635, 637 (Pa. 1979).

Here, we did not find that the evidence established beyond a reasonable doubt that there was an agreement between Mr. Nair and Defendant to commit murder. There is no question that Mr. Nair provided information to Defendant via text message which she used to commit the murder. However, Mr. Nair testified at trial that while he provided said information to Defendant, he did not think that she was seriously going to go through with the act. If, looking back on it, he were able to do something different on March 24, 2011, he stated he would "use my head a little bit better. Not told her how to load that firearm; and...if I thought she was serious about it, I'd have called the State Police and maybe that girl's life would have been saved right now." Trial Tr. 1.119., Nov. 12, 2014. Mr. Nair also testified that he "told her that spending her life in prison was not worth doing that." *Id.* at 1.129. He

31

explained that he sent this message to Defendant discouraging her from going through with committing the murder because "half of me was hopin' that she wouldn't do it; and the other half thought: Well, maybe she's just crazy enough to do it." *Id.* at 1.158. Mr. Nair stated, "If I could go back and redo it all, I would have called the state cops regardless if I was in Somerset or 70-something miles away in Bentleyville [which is where he was located at the time]." *Id.* at 1.159.

We note that "[i]n criminal proceedings, the credibility of witnesses and weight of evidence are determinations that lie solely with the trier of fact, [which] is free to believe all, part, or none of the evidence." *Commonwealth v. Lewis*, 911 A.2d 558, 566 (Pa. Super. Ct. 2006). We found credible Mr. Nair's testimony that he was at least partially in doubt as to whether Defendant was going to follow through with commission of the murder. And between Mr. Nair's testimony, and the ambiguity inherent in text messages (wherein one must judge another person's true meaning without the aid of vocal tones, facial gestures, body language, etc.), we found that there was not enough evidence to prove beyond a reasonable doubt that there was an agreement between Mr. Nair and Defendant (particularly on Mr. Nair's end) to murder Tory Minnick. However, the fact that we did not find a conspiracy between Defendant and Mr. Nair does not logically preclude us from considering mitigating circumstances.

We did not find convincing Defendant's argument that Mr. Nair enticed her to commit the murder or that he planted in her mind the idea to commit the murder. To begin with, the evidence shows that Defendant sought Mr. Nair out for information concerning whether she could buy shells, how to use the gun, and where to buy ammunition. The evidence further shows that Defendant formed the idea to murder the victim in the morning while she lay

32

sleeping; even after all of her communications with Mr. Nair, it was Defendant who sat on the bed next to the victim as she slept, deliberating whether to go through with the murder.

Defense counsel, in presenting mitigating circumstances to the court during argument near the conclusion of the trial, stated, "We are asking [the court] to recognize that this young girl should be shown mercy." Trial Tr. 2.356, Nov. 13, 2014. *See also, id.* at 2.354-55. Before announcing the verdict, we stated that the emotions Defendant was feeling prior to the murder "as powerful as they may have been, cannot serve as the basis for mercy now." *Id.* at 3.370. We continued,

> Mercy, after all, is what should have been granted Miss Minnick as she lay sleeping those last 20 minutes of her life. Yet, the defendant's mercy was not then forthcoming. Mercy holds a proper place in our system of justice to be sure; but sadly, the time for granting mercy in this case has long [passed].

*Id.* at 3.370.

We further found Defendant's attempts to avoid responsibility incredible; for example: Defendant initially fabricated a story about an intruder. In her second written confession, Defendant stated, "I was not in my right state of mind cause I was taking Unisom sleeping pills and they were making me think weird thoughts or disturbing thoughts," yet when asked when the last time she took a sleeping pill was and how long the effect usually lasted, she stated the dosage as "one or two at a time…once a day," with the last dose being "a couple days ago," or "last week[;] I didn't take any for awhile," and the effect lasting for "usually a couple hours." Com.'s Ex. Y, pgs. 115-16. Defendant also stated that Mr. Nair "actually talked me into going and getting the shells," *id.* at 80, when the text exchange shows that Defendant approached Mr. Nair asking if she could buy the ammunition, rather than Mr. Nair convincing her to go get the ammunition. Com.'s Ex. M.

33

Based on the evidence, and our credibility determinations, we could not find beyond a reasonable doubt that Mr. Nair and Defendant reached an agreement that the murder should occur; nor are we convinced that, even considering the aid Mr. Nair provided Defendant in a poor exercise of judgment, that Defendant is any less culpable for having received useful information. Defendant formed the specific intent to kill at many points along the way to this murder, most saliently in the fifteen to twenty minutes prior to completing the act. We found that any aid and encouragement she received does not mitigate her formation of that specific intent to kill.

## F. Verdict Against the Weight of the Evidence.

Lastly, Defendant claims our verdict was against the weight of the evidence. Def.'s Statement, 3.

When there is a claim that a verdict is against the weight of the evidence, our role "is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal quotations and citation omitted). In other words, we must determine "whether the preponderance of the evidence opposes the verdict...." *Id.* at 1056 (internal quotations and citation omitted). We addressed this matter in our prior 1925(a) Opinion, which we reproduce below:

> The Defendant asserts that the verdict was against the weight of the evidence. However, she does not specify how or why the verdict is against the weight of the evidence and I am at a loss to identify the evidence that she believes is a counterweight to a verdict of first degree murder. The Commonwealth produced evidence of the Defendant's confession; a death certificate; an autopsy report to include the manner and cause of death; a ballistics report; and the handgun used to commit the murder. Moreover, the Defendant herself testified that she loaded the handgun and shot the victim in the head while she slept. Trial

34

transcript p. 2.337.

> "A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Vandivner*, 962 A.2d 1170, 1177 (Pa. 2009). I suggest the verdict here was consistent with the weight of the evidence.

Statement Pursuant to Rule 1925 of the Pennsylvania Rules of Appellate Procedure, March 5, 2015 (Geary, J.).

The offense of first-degree murder is defined as follows: "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A.§ 2502(a). Criminal homicide is defined as intentionally, knowingly, recklessly, or negligently causing the death of another human being. 18 Pa.C.S.A. § 2501. An intentional killing is "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502. As we stated when announcing the verdict:

> After having fully considered the testimony of the witnesses and the exhibits placed into evidence by the Commonwealth and the defendant, I find that the Commonwealth has proven the following pertinent facts beyond a reasonable doubt:
>
> No. 1: On March 25th, 2011, at Jerome, Somerset County, Pennsylvania, the defendant intentionally caused the death of Tory Minnick by twice shooting her in the head with a .357 caliber handgun. The defendant shot Miss Minnick while Miss Minnick slept.
>
> No. 2: The defendant first contemplated killing Miss Minnick about one week before March 25th, 2011.
>
> No. 3: During the evening of March 24th, 2011, the defendant informed Billy Nair by way of text message that she intended to kill Miss Minnick the following morning.
>
> No. 4: During the evening of March 24th, 2011, the defendant drove to Gander Mountain Sporting Goods Store and purchased

35

with cash a box of 50 cartridges for a .357 handgun.

No. 5: During the evening of March 24th, 2011, the defendant texted a photo of the .357 caliber handgun to Mr. Nair and requested that Mr. Nair explain to her how to load and fire the handgun. Mr. Nair supplied the defendant with the information that she had requested.

No. 6: Immediately prior to shooting Miss Minnick, the defendant sat on the bed beside Miss Minnick while she slept; and for about 15 to 20 minutes, contemplated whether she should kill Miss Minnick. Ultimately, the defendant made the conscious decision to go to another floor of the house, retrieve the handgun, load it, return to the basement where Miss Minnick slept and shoot Miss Minnick twice.

No. 7: When Miss Minnick did not immediately expire as a result of the gunshots, the defendant struck Miss Minnick in the head twice with a hammer causing her to finally expire.

The elements of the offense of murder of the first degree are as follows:

First:   A person is dead;

Second:  The defendant killed that person;

[T]hird:  The defendant did so with the specific intent to kill and with malice.

Here, I find that the defendant's text message to Billy Nair indicating that she intended to kill Miss Minnick and the preliminary steps taken by the defendant to bring about the killing and the manner in which the defendant killed Miss Minnick, taken together, clearly demonstrate that the defendant possessed the specific intent to kill with malice.

Trial Tr. 3.369-70, Nov. 14, 2014. While Defendant's specific intent to kill can properly be said to have arisen at multiple times (e.g., when she text messaged Mr. Nair; when she purchased the cartridges; when she retrieved the gun, etc.), we believe without a doubt that Defendant formed the specific intent to kill in the fifteen to twenty minutes she spent sitting on the bed beside the sleeping victim, when Defendant, by her own admission, deliberated

36

over whether to murder the victim while she slept.

No evidence was adduced which, if believed, would counterbalance these facts. Therefore, we submit that the verdict here was consistent with the weight of the evidence.

RESPECTFULLY SUBMITTED:

D. Gregory Geary, P.J.

Dated: March 7, 2016

37